METROPOLITAN LIFE INSURANCE COMPANY AND THE NATIONAL LIFE & ACCIDENT INSURANCE COMPANY *v.* GRAVES.

4-6063, 4-6064 (consolidated) 143 S. W. 2d 1102

Opinion delivered October 28, 1940.

*Harry Cole Bates, Walter N. Killough,.Moore, Burrow & Chowning* and *James Robertson,* for appellants.

*Giles Dearing,* for appellee.

MEHAFFY, J. Ancel H. Graves brought suit in the Cross circuit court against the Metropolitan Life Insurance Company and alleged that it was a foreign corporation engaged in writing life insurance and authorized to do business in Arkansas; that the appellant, in 1937, executed and delivered to Allen P. Graves its policy insuring his life against accidental death, for the sum of $2,000; that the appellee is the beneficiary named in the policy and is the widow of the said Allen P. Graves; that all the premiums were paid promptly and that on May 2, 1939, while the policy was in full force and effect and while insured was still an employee of the Lion Oil Refining Company, the said Allen P. Graves died as a result of gunshot wounds accidentally inflicted on him on said date; that his death was due solely to violent, external and accidental means; immediate notice was given to appellant of insured's death and demand made for payment, but the appellant refused to pay said claim or any part thereof; that there was due, at the time of filing the complaint, $2,000 with interest, 12 per cent. penalty, and a reasonable attorney's fee.

The Metropolitan Life Insurance Company filed answer admitting that it was a foreign corporation engaged in writing life insurance, and that it was authorized to do business in Arkansas, and it denied each and every other material allegation.

Ancel H. Graves also brought suit in the same court against the National Life & Accident Insurance Company on two policies alleged to have been issued by the appellant, and alleged that the premiums on the policies

were paid, and the same were in force at the time of the death of Allen P. Graves; that proof of death was made, and appellant denied liability on the ground of suicide.

The National Life & Accident Insurance Company filed answer admitting issuing the policies, but alleging that Graves committed suicide within the two-year period, and that its liability is limited to the amount of premiums paid with 6 per cent. interest, on one policy; admitted issuing the second policy, but denied that the gunshot wound was accidentally inflicted. This appellant made tenders of what it claimed to be due.

The cases were consolidated for trial by consent, and on November 13, 1939, the jury returned a verdict for the appellee on each policy, $1,998.52 on one policy and $350 on the other policy.

There was a verdict and judgment also against the Metropolitan Life Insurance Company. Motions for new trial were filed in each case, which were overruled, and the cases are here on appeal.

About the only difference in the pleadings is that the National Life & Accident Insurance Company pleaded suicide as a defense, and the Metropolitan Life Insurance Company simply denied the allegations of the complaint. Each company defended on the ground that Graves'. death was not accidental, but that he committed suicide.

In the Metropolitan case, Ancel H. Graves, the widow of Allen P. Graves, testified in substance that she and Allen P. Graves were married on August 19, 1933, and that she has a little girl two years old; that Allen P. Graves died on May 2, 1939; he was agent for the Lion Oil Refining Company; had worked for this company since 1931, and had been wholesale agent since 1936; he drew a commission, and in the winter months it amounted to a little more than $300 per month; in the summer months it ran over $400; he did not own his home, but was buying it; it was nicely furnished; there never was any domestic trouble between them; he had a happy home and was devoted to appellee and the baby; at his death he was still employed by the Lion Oil Company; he

had his desk and telephone in the dining room, and when orders came in he would get his trucks to make deliveries; he owned a truck and automobile; the truck was paid for, but he lacked a few payments having his car paid for; this equipment was in good condition; his books were audited about every 60 days; after his death they were audited by the auditor of the oil company; the oil dealers for the company were to be there the next day for a banquet; they had requested Mr. Graves to make arrangements for the meeting, and he had done this; on the day of the tragedy Mr. Graves got up about as usual; he was always happy and very smooth tempered; was not easily irritated; his business was prosperous; his customers satisfied with his dealings; on the morning of the tragedy Mr. Graves was making arrangements for the meeting; the last time witness saw him before the accident was about two o'clock that afternoon; he was home for lunch and again about two-thirty; he was in a happy mood and wanted to hurry and get his work all done and go on and complete his arrangements for the people he wanted to invite; he was not drinking that day; he did not stay at home all afternoon; she went to the beauty shop where his sister worked and came home about eight o'clock; she called Mr. Graves before she went home, and he answered the 'phone; when she went home she found Mr. Graves and his brother, Burley, there; Tom Baker was there, but left immediately; after Burley and Mr. Baker left Graves helped witness prepare frog legs for supper; Burley lived with his aunt in another part of town from where witness lived; Burley came back and then Everett Nix came to talk to Burley about an insurance policy; he was trying to write Burley an insurance policy; it was close to nine o'clock when he came; witness, Mr. Graves and Burley were in the kitchen; witness was getting ready to prepare supper; Burley and Nix talked about the insurance policy and Burley said he had an old insurance policy and Allen had that policy there and Everett wanted to see it; they were looking for it in the desk and could not find it; they then came back in the kitchen where witness was and Mr. Graves was helping her; witness could not say who

mentioned it, but someone brought in some dice and Everett and Burley played; Graves was not in the game; he was helping her; it was just a friendly game; witness' husband would pick up the dice sometimes and throw them and then turn around and leave it; they were shooting a nickel or dime, something like that, but Nix was the winner; he gave the money that he won from Burley back to him; if either of them drank any liquor witness did not know it; her husband was not under the influence of liquor; Nix left about ten-thirty and when he left everybody was happy; witness' husband and brother-in-law were not mad or anything like it; no one was mad; Nix had not been gone more than ten minutes before the tragedy occurred; witness' husband asked Burley if he was ready to eat; after Nix went out Mr. Graves and Burley were still in the kitchen talking about the insurance, and her husband said he wanted Burley to get it because it was a good policy; he said: "Wait a minute, I will show you my policy." He said he wanted to show Burley the policy so he would know what he was getting; witness' husband went into the dining room and sat down at his desk while witness was sitting in the living room directly across from where she could see him; he kept his books and papers in the desk; after his death witness got the policy of the National Life from the desk and there was blood all over it; her husband owned a pistol and was very fond of it; witness knows that her husband saw the pistol and handled it a night or two before when Mitchell was there; witness' husband said, "I want to show you a good gun." He went to the desk and got the gun out and Mitchell said that was one thing he did not know much about; witness' father told Allen to put it up and he did; witness was looking at her husband; he did not say anything to Burley after he left the kitchen after he told him he wanted to get his policy; from the time he said that until the gun fired he did not speak a word to anyone; he sat down and opened the drawer; the gun was laying on the papers; her husband was right-handed; he started looking for the papers and the gun was laying on them; he could not look through them; he picked the gun up and started to lay it on the

table; a day or two before he had cleaned up the gun and instead of laying it down he had it in his hand looking at it; he started to lay the gun down; he was sitting there looking it over and he took his left hand and spun this around and was just pranking with it like that (illustrating); does not know that the gun went off immediately, but when he snapped the gun back in place he was still; had his head down looking through these papers and he had the gun in his hand playing with it, as witness showed the jury; just does not know whether he cocked the gun or not; his handling the gun did not excite the witness; she knew he handled it quite a lot; has seen him many times; the gun went off; he did not speak from the time he was shot; he was killed instantly; witness does not know where the bullet entered his body, they would not let her see it; the gun had accidently discharged in his hand on another occasion; witness had a girl, Fay Martin, staying there at the time; she was sitting in the living room holding the baby; insured went into the bedroom to get a handkerchief and picked up the gun and pointed it out the window and pulled the trigger and the gun fired; he carried the gun on his truck in making deliveries because he had quite a bit of money; he took an interest in public affairs and was very much interested in business; was interested in outdoor sports, mostly fishing and hunting; he went on those parties every chance he got; sometimes he took his gun with him; there had never been any financial trouble in connection with anything prior to his death; there was no domestic trouble; witness knows of no reason on earth why he should have destroyed himself intentionally.

On cross-examination witness testified in substance that the policy involved in the suit is a type of insurance that is known as group insurance, but does not know whether it was written through the Lion Oil Refining Company or not, but they held it out of his check each month; witness understands that insurance of this type is partly paid for by the company and partly by the employees; the witness recalls that about $5.20 was deducted each month from his salary; under this plan he had $2,500 life insurance and $2,000 accident insurance, and some

health benefits; the company, following his death, gave witness $2,500 life insurance, as distinguished from the accident insurance. If witness' husband took a drink with Nix and his brother, Burley, she did not know it; he would take drinks, but he never drank on duty; but it was not unusual for him to take one or two drinks in the evenings with friends; witness did not know who the dice belonged to; she has known Everett Nix a long time and they have always been friends; and his wife has been friendly with her too; they never had any trouble; the time when Mr. Graves pointed the gun toward the window and pulled the trigger was the only time witness ever saw the gun go off; when Nix left, all of the food had been prepared and had been cooked, and all that needed to be done before they sat down to the table was simply setting the table; dining room is directly between living room and kitchen.

Attorneys for appellant asked the witness to demonstrate before the jury like she did in the National Life & Accident case how deceased handled the gun; asked her to take the gun, throw the cylinder out and spin it, and again demonstrate slowly the motion he went through; her answer was: "He took his left hand and opened this, like (indicating) and then he snapped it like this, and then he placed his elbow back on the desk and in looking in the desk he just had the gun like this, pulled it back and forth (indicating)." She said she did not think she said in the other case that the gun discharged at the time the cylinder closed. He started whirling the gun, still had it in his hand and it went off: "I don't know how many minutes or how many seconds it was after that." He did not point it directly at his head; he did not notice where he was pointing the gun; he was looking through the papers. Witness here took the gun and indicated to the jury, at the request of appellant. When deceased shot himself witness ran to him and saw he was shot, and Burley 'phoned for a doctor, and she does not know exactly what she did; she tried to attract Mr. Stewart's attention and called his house; Everett Nix had been gone from her home about ten minutes, and he and his wife came back in a short time; she did not make the state-

ment that Allen had said: "I just believe I'll blow my brains out." He did not make that statement.

Everett Nix and his wife testified that they heard appellee make a statement about deceased's saying he was going to "blow his brains out."

The evidence was not only overwhelming, but undisputed, that the deceased was in good health, had a good business, was devoted to his wife and child, and that so far as anyone knew there was no reason for him to commit suicide. Every fact and every circumstance proved tends to strengthen the presumption that he did not commit suicide.

Appellants introduced gunsmiths who were experts, who testified that the accident could not have happened as it was described by appellee.

Everyone who testified about the pistol, including the experts, admitted that if the gun was cocked when deceased was flourishing it that the accident could have happened.

There is evidence, introduced by appellants, to show that other persons said that deceased had said he was going to "blow his brains out." This evidence is positively denied by the persons who were said to have made the statement; but there is no evidence from anyone that deceased made these statements. The evidence is simply that they heard someone else say that he made these statements.

There are two cases which were consolidated and are tried together. The National Life & Accident Company case was tried first in the lower court, and some of the evidence introduced in that case was introduced in the Metropolitan case; that is, they introduced statements or testimony that witnesses had given in the other case. The Metropolitan Life Insurance Company simply denies the allegations of the complaint; that is, denies that deceased was accidentally killed. The National Life & Accident Company pleads suicide. The pleas really amount to the same thing.

Under the facts in this case, deceased was either accidentally killed or he committed suicide, and, therefore, the only question in the case to be determined by us is whether or not, under the evidence, the jury was justified in believing that he accidentally killed himself.

It is argued that the evidence of the appellee in describing how the accident occurred is unworthy of belief, and that where personal testimony is at variance with physical facts, and such repugnance is material and is also self-evident, improbable conclusions drawn in favor of a party litigant, through sanction of a jury's verdict will not, on appeal, be conclusive if in conflict with recognized elements of time, mathematics, and the accepted laws of physics. The case of *Magnolia Petroleum* v. *Saunders,* 193 Ark. 1080, 104 S. W. 2d 1062, is cited in support of this doctrine.

There is no testimony in this case that is at variance with physical facts. The appellee, in testifying, stated that she did not know whether the pistol was cocked or not. If it were cocked, it could have happened just as appellee said it did, and there are no physical facts contradicting her testimony. It must be remembered that appellee was sitting about ten feet from deceased, and at the trial described what she thought happened. She was evidently very much upset when it happened, and it would have been difficult, if not impossible, for her to recall all the details.

Moreover, if there were no evidence from appellee, if her evidence be entirely disregarded, still the appellants did not overcome the presumption against suicide.

"Another apt statement of the rule is that where the cause of death is unexplained or undisclosed by evidence, or where evidence tending to prove self-destruction is contradicted, or impeached, or some evidence adduced is consistent with a reasonable hypothesis that the death was not self-caused, the presumption against suicide prevails. And if there be a doubt, the evidence being conflicting and nearly evenly balanced, whether the death was caused by suicide or accident, the presumption is in favor of accident. So, where the evidence points equally

or indifferently to áccident or suicide, the theory of accident is adopted. And the force of the presumption based upon the love of life must, it is decided, be given effect against the defense of suicide, unless the evidence discloses no other reasonable hypothesis. So, where the evidence in an action on an accident policy shows that the insured suffered an injury which has caused death, and there is no proof in the record from which it can be determined whether the injury was accidental or self-inflicted, the presumption is that the injury was accidental, and not self-inflicted.'' 8 Couch on Insurance, 7242.

It is also stated in the same volume on pages 7245 and 7246: ''These presumptions arise from the natural love of life, the fact that voluntary self-destruction is contrary to the common conduct of mankind, and the criminal aspects of self-destruction. As has been well said, the presumption rests primarily upon common knowledge of the impulses and normal conduct of men, namely, the inherent natural desire to live, and the fact that voluntarily to take one's own life is to run counter to every natural sane impulse.''

This question has been before this court many times, and it has uniformly held that there is a presumption against suicide. This court said in the case of *Grand Lodge, A. O. U. W., v. Banister,* 80 Ark. 190, 96 S. W. 742: ''In the first place, there is a presumption against suicide or death by any other unlawful act, and this presumption arises even where it is shown by proof that death was self-inflicted—it is presumed to have been accidental until the contrary is made to appear. This rule is founded upon the natural human instinct or inclination of self-preservation, which renders self-destruction an improbability with a rational being.'' To support this statement, the following cases were cited: 19 Am. & Eng. Enc. Law, p. 77; *Travelers' Ins. Co. v. McConkey,* 127 U. S. 661, 8 S. Ct. 1360, 32 L. Ed. 308; *Conn. Mut. Ins. Co. v. McWhirter,* 73 Fed. 444; *Stephenson v. Bankers' Life Ass'n,* 108 Ia. 637, 79 N. W. 459; *Leman v. Manhattan Ins. Co.,* 46 La. Ann. 1189, 15 So. 388, 24 L. R. A. 589, 49 Am. St. Rep. 348; *Home Benefit Ass'n v. Sargent,* 142

U. S. 691, 12 S. Ct. 332, 35 L. Ed. 1160; *Walcott v. Metropolitan Ins. Co.,* 64 Vt. 231, 24 Atl. 992, 33 Am. St. Rep. 923; *Mutual Life Ins. Co.* v. *Wiswell,* 56 Kan. 765, 44 Pac. 996, 35 L. R. A. 258; *Supreme Council* v. *Brashears,* 89 Md. 624, 43 Atl. 866, 73 Am. St. Rep. 244.

The presumption in this case is greatly strengthened by the proof as to the habits and character of deceased. He was happily married, devoted to his wife and child, a man of good character, prosperous in his business, and there is no reason suggested by anyone why he should want to kill himself. There is not, in the evidence, the slightest indication of any preparation for death, and if he secretly harbored the intention of taking his own life, he gave no intimation of it before death, nor left behind him any disclosure to kindred or friends. It is not impossible that the shooting was accidental.

"It is the settled law in this state that the proof of death of an insured from injuries received by him raises a presumption of accidental death within the meaning of an insurance clause insuring against injury by external, violent and accidental means, and this presumption will continue until overcome by affirmative proof to the contrary on the part of the insurer." *Pacific Mutual Life Ins. Co.* v. *Harris,* 187 Ark. 772, 63 S. W. 2d 219.

It was the province of the jury to pass on the facts, and this court said recently: "If reasonable men, viewing the facts, which are undisputed, might come to different conclusions as to whether the deceased committed suicide, then the facts, although undisputed, were properly submitted to the jury." *Great Southern Fraternal Union* v. *Ewing,* 178 Ark. 543, 11 S. W. 2d 453; *Nat'l Life & Acc. Ins. Co.* v. *Blanton,* 192 Ark. 1165, 97 S. W. 2d 77.

If it were not impossible that deceased accidentally killed himself, it was then the province of the jury to determine from the evidence whether it was an accidental killing or suicide. We said in the case of *Missouri & N. A. Rd. Co.* v. *Johnson,* 115 Ark. 448, 171 S. W. 478: "We will not reverse the judgment because of the insufficiency of the evidence, for, as we view this evidence, it is not physically impossible that appellee was injured

as the result of stepping into an unblocked frog, although it is highly improbable that the injury was caused in that manner." *Baldwin* v. *Wingfield*, 191 Ark. 129, 85 S. W. 2d 689.

Under the facts in this case, it was for the jury to say whether the killing was accidental or suicidal, and its verdict cannot be disturbed by this court.

The judgment in each case is affirmed.