UNION CENTRAL LIFE INSURANCE COMPANY *v.* SIMS.

4-7694 18 S. W. 2d 193

Opinion delivered June 25, 1945.

1070

Hill, Fitzhugh & Brizzolara, for appellant.

R. A. Young, Jr., Pryor & Pryor and Partain, Agee & Partain, for appellee.

GRIFFIN SMITH, Chief Justice. Double indemnity incident to policies of insurance—one for $1,000, the other for $1,500—is involved. From judgment on adverse jury verdicts the Company has appealed.

The plaintiff, widow of Lee Sims, alleged that her husband's death occurred through accidental means as defined by the policies. The Company paid the principal sums, but resisted demand for the additional amounts.

The motion for a new trial contains thirty-six assignments. Since we have concluded that the Court erred in refusing to give the defendant's requested Instruction Number 1 (peremptory), it becomes unnecessary to discuss other contentions, except those relating to presumptions.

Each policy provides that ". . . double indemnity benefit shall not be payable if death of the insured shall occur as the result directly or indirectly of any violation of law by the insured."

It is admitted that State Policeman Pritchard, forty-three years of age, killed Sims the evening of May 5, 1943, a little after dark. Pritchard and Sowell, also of the State Police force, were working together, but had stopped at the highway intersections near Alma, generally referred to as the "Y." One branch (Highway 71) leads to Fayetteville and beyond. A speeding automobile had been detained by Sowell, who was talking with the driver, when a second car (subsequently found to have been driven by Sims) passed at such rate of speed as to attract attention. Only one headlight was functioning. Sowell called Pritchard's attention to what appeared to be law violations—that is, driving too fast, and operating with deficient headlight. Jack Faught, a boy Sowell had "picked up" at Ozark, reëntered the police car with Pritchard, and Pritchard undertook to overtake Sims, who at the time the officers drew near enough to effectively sound his siren was making sixty-five miles an hour by speedometer check. Pritchard drove alongside the Sims car in an effort to attract the driver's attention. In testifying, he was not able to say definitely that Sims saw him, the statement being, "There wasn't anything to keep him from it." "But," said Pritchard, "the second time I pulled up by him and sounded the siren, he looked around."

The police car was plainly marked "with a wide yellow stripe over the hood that starts at the front and comes back"; also it bore the emblem, "Arkansas State Police." This was painted on the side. Pritchard was in uniform and wore the regulation hat or cap, with other insignia and dress. About half a mile farther the officer made his third attempt to detain the speeding driver; but was prevented from maneuvering into a parallel position when Sims "cut across" to the left, measurably blocking the way while still proceeding at a rapid rate of speed. Pritchard continued to sound his siren at intersections, but did not keep it in continuous operation.

The race proceeded beyond Mountainburg to a point approximately fourteen miles from the Alma "Y." Pritchard testified that in passing through Mountainburg (two miles nearer Alma than where the tragedy oc-

curred) the cars were making sixty-five miles per hour. Young Faught, who watched the speedometer, was quoted as saying the speed was ninety miles. Sims' car was a Ford, 1940 model; Pritchard's was a 1942 Ford.

The highway by which Mountainburg is reached from the south passes through a mountainous section, with a substantial downgrade, followed by comparatively level ground for a short distance before entering the town. Beyond, for a mile or more, the road is level, then a creek is crossed, and again there is a hill, or heavy grade.

According to Pritchard's version, Sims gained while going downgrade to Mountainburg; although, according to the officer, "I was running the limit of my car speed at the time."

In an apparent attempt to evade his pursuer, Sims —who was then approximately two hundred yards ahead of the police car—turned into a side road. In commenting on this conduct Pritchard said: "As I raced by I noticed his lights go out and I turned and came back." Pritchard parked his car on the highway approximately fifty feet from Sims, as to whose identity he was still uninformed. He walked the intervening distance, holding a flashlight in his left hand, and directing its beams through the left rear window of the darkened car. In the glare of the flashlight Pritchard saw Sims reach into the glove compartment of the cowl. The officer opened the car door, flashed his light in Sims' face, and said, "Mister, what's wrong with you? I have run you from Alma here. Come out of there." Sims replied, with an oath, "I will come out," and promptly struck Pritchard's hand, knocking the flashlight from it. Pritchard says that he only had a glimpse of the instrument with which he was struck, but thought it was a gun. He retaliated by striking Sims on the forehead with his service revolver, the weapon not having been drawn until Sims became aggressive. Almost instantaneously Pritchard said, "Come on out!"; and Sims, again cursing the officer, replied, "I'll kill you!"—or, as the officer testified on cross-examination, Sims said (with an oath), "I'll

get out and kill you!'' Sims then stepped out of his car, and "pretty well straightened up"; whereupon, Pritchard fired one shot.

Dr. Charles S. Holt testified that the bullet entered under the left arm, traveled almost in a horizontal course to the opposite side and lodged in bony structure. Its course was just above the heart. The arch of the aorta was perforated, causing instant death. It was the physician's belief that there was no period of consciousness, since the brain's blood supply was cut off.

When Sims "slumped to the ground" Pritchard heard a gurgling sound indicating physical distress. He impulsively attempted to aid the unfortunate man, and in doing so blood was smeared upon the officer's shirt. This came from the wound inflicted on Sims' forehead when he was struck with the pistol. Pritchard hailed a passing truck and sent for Sheriff Maxey of Crawford County.

Pritchard's companion, young Faught, remained in the officer's car and did not hear enough of the conversations or comments to affirm or contradict the officer in a substantial manner.

. . . . .

The question is, Was there substantial support for the jury's finding that the insured came to his death through accidental means, and that death was not the result, directly or indirectly, of any violation of the law?

Pritchard apprehended, according to his testimony, that the speeding automobile had been stolen and was driven by the taker. It is insisted, upon the other hand, that Sims probably believed he was being pursued for the purpose of robbery, and that he did not suspect—or, as a reasonable man, did not have grounds for believing—that the car following him had an official status. Before starting on his journey Sims telephoned his wife he was going on a trip and that if delayed he might spend the night at his mother's home. Mrs. Sims prepared some clothing for his convenience. The decedent's mother lived near the highway on the side road or trail to which Sims

had recourse, and where he was parked when the tragedy occurred.

. . . . .

The condition of Sims' body, showing fatal bullet wound, created a presumption that death was accidental, and the jury was so instructed. The instruction went further by stating that this presumption attached throughout the trial.

A naked presumption, though sufficient to justify a verdict for the party in whose favor it exists, must nevertheless give way to facts. It is merely a rule of evidence casting upon the defendant the burden of proving that the transaction occurred in a particular way. And even during trial, where it is doubtful from the evidence whether death was caused by accident or by suicide, there is a presumption in favor of accident; and this presumption will stand and be decisive of the case until overcome by testimony which outweighs the presumption. Ruling Case Law, v. 14, pp. 1236-7; *Fidelity Mutual Life Insurance Co.* v. *Wilson,* 175 Ark. 1094, 2 S. W. 2d 80. In *Benefit Association of Railway Employees* v. *Jacklin,* 173 Ark. 937, 294 S. W. 353, Mr. Justice MEHAFFY said for the Court that ''Even where the proofs of death show that the deceased committed suicide, still it is a question for the jury to determine; and, although such proof has been made by the plaintiff, the presumption is that the deceased did not commit suicide, and that presumption prevails until it is overcome by proof to the contrary.'' But the same Justice, in the Fidelity Mutual case, *supra,* held as a matter of law that the contention in favor of suicide should have been sustained.

The precise time during trial when the presumption disappears, if it does vanish, has not been clearly defined by our cases. Mr. Justice WOOD, in *Watkins* v. *Reliance Life Insurance Co.,* 152 Ark. 12, 238 S. W. 10, said that the appellant (plaintiff below) established a *prima facie* case against the Company when she made proof that her son died as a consequence of violent and external means. ''In such cases,'' says the opinion, ''the presumption is that death is accidental, and the burden was upon the

appellee Company to overcome the presumption." An expression in *Guardian Life Insurance Co.* v. *Dixon,* 152 Ark. 597, 240 S. W. 25, is that the presumption "stands until overthrown by evidence in favor of the insurer." And again: "The question presented for our determination is whether . . . the evidence for the insurance companies has overcome the presumption as a matter of law."

Mr. Justice McCULLOCH, while discussing presumptions in *Grand Lodge of A. O. U. W.* v. *Banister,* 80 Ark. 190, 96 S. W. 742, reasoned as follows: "Conceding that the theory of death by suicide finds more rational support in the facts established by proof than the theory of death by accident—that there is greater probability from the evidence that death resulted from a suicidal act than an accident—still we cannot say that death by suicide is the only reasonable conclusion to be drawn from the evidence. The proof does not exclude with reasonable certainty death from accidental shooting."

In affirming judgment against the insurer in *Grand Lodge of A. O. U. W.* v. *Wood,* 113 Ark. 502, 168 S. W. 1070, Chief Justice McCULLOCH said it was not "conclusively" shown that the deceased committed suicide.

The Supreme Court of the United States, in construing a presumption somewhat similar to our § 11138, Pope's Digest, held that a statute [of Georgia] which, upon the mere fact of a collision between a train and a vehicle at a highway crossing raised a presumption that the railway company and its employees were negligent, and that every act or omission alleged in the complaint of Henderson in a suit for damages was the proximate cause of the resulting death, permitting the jury to consider and weigh the presumption as evidence against testimony of the company's witnesses tending affirmatively to prove due care, was unreasonable and arbitrary, and that it violated the due process clause of the Fourteenth Amendment. *Western & Atlantic Railroad* v. *Henderson,* 279 U. S. 639, 49 S. Ct. 445, 73 L. Ed. 884. See *St. Louis-San Francisco Ry. Co.* v. *Cole,* 181 Ark. 780, 27 S. W. 2d 992; *Chicago, Rock Island & Pacific Railway Co.* v.

*Fowler,* 186 Ark. 682, 55 S. W. 2d 75; *Missouri Pacific Railroad Company* v. *Ross,* 199 Ark. 182, 133 S. W. 2d 29; *St. Louis-San Francisco Railway Co.* v. *Mangum,* 199 Ark. 767, 136 S. W. 2d 158; *St. Louis-San Francisco Railway Co.* v. *Hovley* (opinion on rehearing), 199 Ark. 853 at p. 858, 137 S. W. 2d 231.

In the Cole case (cited above) the opinion (written by Mr. Justice MEHAFFY) approved the rule announced in *St. Louis, Iron Mountain & Southern Railroad Company* v. *Landers,* 67 Ark. 514, 55 S. W. 940, where it was held that ''The jury could not arbitrarily disregard the testimony of the engineer and fireman.'' The Justice then said: ''Under the construction placed upon statutes like ours, the presumption of negligence is at an end when the railroad company introduces evidence to contradict it, *and the presumption cannot be considered with the other evidence.''* Likewise, in the Ross case, *supra,* the holding was that ''If the presumption 'is at an end when the railroad company introduces evidence to contradict it and if it cannot be considered with the other evidence' in such cases, *it has no place therein.''*

In the Mangum case Mr. Justice MEHAFFY said that Instruction No. 3 was erroneous because ''. . . it gives effect to the presumption and it is to be weighed against opposing testimony, and is to prevail unless such testimony is found by the jury to preponderate. . .. . To permit the presumption to be considered as evidence after other evidence has been introduced, would, as stated by the Supreme Court of the United States, be unreasonable and arbitrary, and would violate the due process clause of the Fourteenth Amendment.''

The Hovley decision says that ''Upon reconsideration we have reached the conclusion that appellants' contention must be sustained and, therefore, the giving of this instruction constituted reversible error.'' The instruction we disapproved contained a direction that ''The defendants, to avoid liability, may show by a preponderance of the evidence that the striking of such automobile was not the result of negligence upon the part of the railroad or its employees.'' The exact point was ruled

on in *Missouri Pacific Railroad Company* v. *Beard, Admr.,* 198 Ark. 346, 128 S. W. 2d 697.

The language in *Pacific Mutual Life Insurance Co.* v. *Harris,* 187 Ark. 772, 63 S. W. 2d 219, was approved in *Metropolitan Life Insurance Co. and The National Life & Accident Insurance Co.* v. *Graves,* 201 Ark. 189, 143 S. W. 2d 1102. The holding was that the presumption of accidental death ''will continue until overcome by affirmative proof to the contrary on the part of the insurer.''

From these cases it is apparent that a distinction is drawn between the effect to be given presumptions founded upon the laws of nature, and those which would not ordinarily arise but for the interposition of a statutory declaration. Where the presumption is a matter of public policy promulgated by the Legislature, it disappears when substantial evidence of facts is introduced; but since the laws of nature and of self-preservation are instinctive, a presumption predicated upon them may not be peremptorily brushed aside by mere contradiction. We think the effect of our decisions where accidental death or suicide were matters of controversy is that the presumption against suicide exists throughout trial, placing upon the insurer the burden of proving its affirmative defense.

Since violation of a law is an exception to the average man's conduct, a presumption arises that persons deport themselves in a lawful manner. In the case at bar Pritchard testified that Sims was violating statutes the officer had sworn to uphold. It must be remembered, however, that Pritchard was an interested witness and his testimony will not be regarded as uncontradicted. Another rule of law is that reasonable testimony cannot be arbitrarily disregarded. Even though not uncontradicted, was Pritchard's testimony reasonable? Does the presumption that Sims died from accidental means not resulting directly or indirectly from violation of any law prevail in spite of the testimony and circumstances supporting it?

Mr. Justice Butler said (*Walloch* v. *Heiden,* 180 Ark. 844, 22 S. W. 2d 1020) that an accident is sometimes de-

fined as "an event happening without the concurrence of the will of the person by whose agency it was caused; . . . an undesigned contingency—a happening without intentional causation."

In reversing a judgment on the insurance company's appeal, the Kentucky Court of Appeals (285 Ky. 757, 149 S. W. 2d 510) held that under the accidental death clause of a life policy precluding recovery when death was caused directly or indirectly from violation of law by the insured, the word "indirectly" including a remote cause as well as a direct one; but it further held that even a remote cause must have a reasonable causal effect.

The Texas Court of Civil Appeals (*Amicable Life Ins. Co.* v. *O'Reilly,* 97 S. W. 246) held that where a life policy provided for double indemnity in case of accidental death unless death resulted directly or indirectly from police duty, double indemnity could not be recovered for death of the chief of police who was shot by a person whom the officer had arrested a day previous to the killing. It was said that the arrest was the indirect cause —this as a matter of law in the circumstances of the case.

This Court held, in *Howle* v. *Eminent Household of Columbian Woodmen,* 118 Ark. 226, 176 S. W. 313, that where a policy similar to the one here involved was sued on, liability could not be avoided unless the insured met his death while voluntarily engaged in violation of the law; that where the insured was insane and not responsible for his acts he was incapable of violating the law in the sense intended by the exclusion clause. Cases dealing with the subject are annotated in 17 A. L. R., p. 1005 *et seq.,* and v. 24, p. 977 *et seq.*

In adhering to the reasoning of Mr. Justice McCulloch in the Banister case—but with opposite results—it was held in *Brotherhood of Maintenance of Way Employees* v. *Page,* 197 Ark. 498, 123 S. W. 2d 536, that in an action on an insurance policy excepting death by suicide, evidence afforded by the physical facts outweighed the presumption, "and left no reasonable doubt that the insured committed suicide." There is comment to the effect that this Court "[has] always recognized the fact

that the legal sufficiency of the testimony to support such a verdict was a question of law for the Court."

It is in evidence that Sims had paid fines for violating traffic laws, and that he was critical of State Policemen. There was corroboration of Pritchard's testimony that he was struck on the hand and that Sims was hit on the forehead with some blunt instrument. The wound would physically support Pritchard's assertion that he used his pistol as a club before Sims came out of the car. The instrument Sims held in striking Pritchard was found a short distance from the dead man's right hand. It was a piece of galvanized gas pipe six or eight inches in length with a curved copper or tarnished brass grip, somewhat resembling a pistol grip. On top of the pipe there were two small valves, porcelain-covered. At a distance—and certainly in partial darkness—the instrument might easily be mistaken for a pistol. When Sims went into the side road he turned out the car lights, and at first did not look when accosted by Pritchard. There was substantiation of the race through Mountainburg and the rapid speed at which the cars were traveling. Sims had complained that he was being "pushed around" by officers and had suggested to friends that they "get together" and do something about it.

The method adopted by Pritchard in attempting to stop Sims on the highway was shown to have been regular. There is nothing improbable or fanciful in his expressed belief that one who ignored the police siren and defied arrest might be guilty of a serious transgression and did not propose to be stopped.

In the light of these facts it must be held, as a matter of law, that the jury returned an arbitrary verdict, and that it wholly ignored uncontradicted testimony. Sims' conduct in refusing to submit to arrest precipitated the situation where Pritchard approached the parked car. If, as the officer says, Sims came from the automobile profanely proclaiming that he would kill Pritchard, the latter had a right to defend himself; and if, as a reasonably prudent person, he feared for his life, or apprehended that great bodily injury would result, the law

protected him to the extent of permitting him to use such force as might be necessary to repel the attack.

To reach these conclusions we do not pass upon the abstract question of Pritchard's justification. That issue is not in the case. We only mean to say that undisputed facts show that Sims came to his death, directly or indirectly, because of law violations which were the proximate cause. It was unreasonable for the jury to find otherwise.

Judgment reversed and cause dismissed.

McFADDIN, J., dissents.

McFADDIN, J., (dissenting). The majority holds that appellant was entitled to an instructed verdict on the theory that Sims died as a result of law violations. I dissent, because I am of the opinion that a *jury question* was necessarily presented—that is, the facts as presented necessarily required the drawing of conclusions and inferences, which only a *jury* can do under our system of law. That such a jury question was presented, I will now attempt to demonstrate.

The majority says, in the last two sentences of the opinion: "We only mean to say that undisputed facts show that Sims came to his death, directly or indirectly, because of law violations which were the proximate cause. It was unreasonable for the jury to find otherwise." Passing over the question whether an appellate court has the power to decide whether the verdict is "unreasonable" (which is a serious question in itself), I ask: "what were the *law violations* which the majority submits as the *proximate cause* of Sims' death?" The only violations mentioned in the record are: 1. Traffic violations, and 2. Resisting an officer. I proceed to examine these, remembering always that the burden was on the insurance company to prove its defense.

1. *Traffic violations.* It is clear that these were only *misdemeanors,* and the officer could not have been justified in killing Sims even if he were seeking to escape arrest for those misdemeanors. See *Thomas* v. *Kinkead,* 55 Ark. 502, 18 S. W. 854, 15 L. R. A. 558, 29 Am. St. Rep.

68; *Edgin v. Talley,* 169 Ark. 662, 276 S. W. 591, 42 A. L. R. 1194; *Deatherage v. State,* 194 Ark. 513, 108 S. W. 2d 904. In 18 A. L. R. 1360, in a headnote, the rule is stated from the West Virginia case of *State v. Boggs,* 87 W. Va. 738, 106 S. E. 47, 18 A. L. R. 1360, in the following concise language: "An officer seeking to arrest a misdemeanant is not justified in shooting or wounding a traveler on the highway who he has reason to believe is the misdemeanant and whom he has ordered to halt for the purpose of ascertaining if he is the person for whom he is seeking, where the traveler simply refuses to obey the command and pursues his journey hurriedly and in such manner as would lead the officer to believe he is the misdemeanant, intending an escape." Furthermore, the violations of the traffic laws ended when Sims turned off the highway and stopped his car and turned off his lights. In other words, whatever "encounter" had taken place between Sims and the pursuing officer had been "broken off." *Supreme Lodge K. P. v. Bradley,* 73 Ark. 274, 83 S. W. 1055, 67 L. R. A. 770, 108 Am. St. Rep. 38, 3 Ann. Cas. 872, is directly in point on this phase of the case. So, I submit that under no possible stretch of the imagination could the killing be justified on the theory that Sims had violated the traffic laws and was seeking to escape. The violations of the traffic laws would not have justified the killing, so the killing can not, in law, be held to have been the proximate result of the traffic law violations.

2. *Resisting an officer.* We come, then, to the claim that Sims' death resulted from resisting an officer. But that claim presents, at the very outset, a most serious question of fact, which is: Did Sims know that Pritchard was an officer? I say that only a *jury* can decide that question, because the answer necessitates the drawing of conclusions and inferences from other proven facts.

Section 3725, Pope's Digest, says: "The person making the arrest shall inform the person about to be arrested of the intention to arrest him, and the offense charged against him for which he is arrested. . . ." Notwithstanding this positive provision of the law, Pritchard admits, with commendable candidness, that he

never at any time told Sims that he (Pritchard) was an officer, and never at any time told Sims that he (Pritchard) was arresting him, and never at any time told Sims for what offense he was to be arrested. No one testified that Sims knew that Pritchard was an officer, and Pritchard admits that he did not so inform Sims. The answer to the question—whether Sims knew Pritchard was an officer—must therefore depend on inferences and conclusions. to be drawn from other facts. Let us examine these "other facts": (a) When Pritchard pursued Sims, the pursuing car bore the markings of a State Police car, and Pritchard wore the official uniform. But if Sims was driving at a speed of 60 to 95 miles per hour on a mountain road in the night time—as appellant's witnesses say —then Sims might never have observed the color of the pursuing car or the clothes worn by the driver thereof. These facts do not prove as a matter of law that Sims knew Pritchard was an officer.

(b) The pursuing car had a siren operating on it. But that fact does not prove as a matter of law that the car was then being operated by an officer. The pursuing car might have been an ambulance or other vehicle equipped with a siren. Mischevious boys have been known to use sirens by way of pranking. The fact of the siren does not prove as a matter of law that Sims knew that Pritchard was an officer.

(c) Sims turned off the highway, and his pursuer went on. Sims parked in the dark and turned off his lights. Then a few minutes later a man came to his car with a flashlight. The man—it was Pritchard—never informed Sims that an officer of the law was holding the flashlight. Sims did not know Pritchard or his voice. Sims certainly could not see Pritchard because the beam of the flashlight was in Sims' face. Sims was ordered out of the car. He was never arrested.

(d) Sims threatened to kill the man with the flashlight. But this occurred after the man with the flashlight had administered a terrific blow to Sims. There is no proof but what the blow "addled" Sims. But at all events.

Sims came out of the car at the command of Pritchard, and was instantly killed before he had time to stand erect.

Now, I maintain, that before it can be said as an undisputed fact that Sims was resisting an officer, it must be indisputably proved *as a fact* that Sims knew that Pritchard was an officer. No one has so testified. The establishment of that fact can be done only by drawing inferences and reaching conclusions from other facts, some of which I have detailed and answered herein. Who should draw these inferences and reach these conclusions? *The jury.* Our cases all hold to that effect. In *Grand Lodge of A. O. U. W.* v. *Banister,* 80 Ark. 190, 96 S. W. 742, Mr. Justice McCulloch said: "If the facts are such that men of reasonable intelligence may honestly draw therefrom different conclusions on the question in dispute, then they are properly submitted to the jury for determination. Judges should not, under that state of the case, substitute their judgment for that of the jury." In *St. Louis Ry. Co.* v. *Coleman,* 97 Ark. 438, 135 S. W. 338, Ch. J. McCulloch said: "When the testimony, though unconflicting, is such that different minds may reasonably draw different conclusions therefrom, then it is the duty of the trial court to submit the issues to the jury for determination, and on appeal the verdict of the jury should not be disturbed." In *St. Louis Ry. Co.* v. *Fuqua,* 114 Ark. 112, 169 S. W. 786, Mr. Justice Hart said: "The rule is that where fair-minded men might honestly differ as to the conclusion to be drawn from facts, whether controverted or uncontroverted, the question at issue should go to the jury." See, also, *Miss. River Fuel Corp.* v. *Senn,* 184 Ark. 554, 43 S. W. 2d 255, and many other cases collected in West's Arkansas Digest, "Trial," § 142, and see, also, 64 C. J. 346. The answer to the question, whether Sims knew Pritchard was an officer, necessarily requires the making of inferences and drawing of conclusions from other facts, and was therefore a question of the jury. I think the majority opinion invades the province of the jury, so I respectfully dissent from the dismissal of the case. There were errors in the instructions which would necessitate a reversal, but the cause should be remanded for a new trial.